SCHENCK, J., took no part in the consideration or decision of this case.
This was an action for actionable negligence, brought by plaintiff against defendant, alleging damage. Plaintiff alleged that by reason of stepping into a water meter on the street, and it belonging to defendant, he had been injured by the negligence of the defendant. The defendant denied the material allegations of the complaint and set up the plea of contributory negligence. Notice of the claim of plaintiff against defendant was duly filed as required by the statute.
The evidence on the part of plaintiff was to the effect: That in the city of West Asheville, about 9 o'clock on the evening of 7 April, 1933, he had tire trouble and started to a filling station with tubes to have them fixed. He was proceeding on the north side of Haywood Road. There was a water meter in front of 841 Haywood Road. Plaintiff *Page 823 
testified, in part: "When I stepped on the lid of a partly covered water meter box — when I did, my left foot and leg went down in the hole and in some way it turned the lid in a vertical position. I don't know whether exactly straight or not, but I fell, and as I did the edge of the lid caught me between my legs on the point of my spine and on my right testicle. That was right in the crotch. I gave a powerful lunge to come out. It was instant pain. In doing so, I tripped in some way and fell again. I fell in sort of a sitting position. I don't know whether a rock, brick, or edge of the rim, but I struck my back a little higher up on some blunt object. Then I got to my feet. I was experiencing the most excruciating pain of my life, and the last I remember I grabbed myself in the crotch and was drawn double, everything turned dark to me. . . . I don't believe I could have seen the condition of the meter box. I did not see it. There was a hedge there and no lights. The nearest light was 202 1/2 feet from the meter box. I don't know how dark it was. I could not see that box or that lid there, partly covered, or I would not have stepped on it. I know it was not fully covered or my leg would not have gone in. I cannot swear exactly what position it was laying in for I did not see it prior to the time I stepped on it. I don't know what condition it was in, except that it, the lid, turned and caught me between the crotch. One caught me in the crotch and I am sure the other was in the hole, somewhere around the hole, bound to be. It was unexpected and I was hurt so bad I cannot give a detailed description of it. I don't know how deep the meter box was."
Plaintiff was at once taken to a hospital and was unconscious for four or five days, and he stayed in the hospital thirty days. The first six months of his injury he spent the greater part of the time in bed, except to go up and visit the doctors.
Dr. J. W. Deyton testified, in part: "The injury will be permanent. In my opinion, he will never be able to perform heavy manual labor or an undue amount of exercise, whether in sports or labor."
Edna Kitchin, a graduate nurse in the hospital, testified, in part: "Mr. Gasque was brought into the hospital, I think, around 9 o'clock, or a few minutes past 9, it was not earlier than 9 at night. The man seemed totally unconscious. I nursed him 30 days, devoting my entire attention to him. Twenty-hour duty, with four hours off during the day or night, when it was convenient for another nurse to look after him, and he was resting so that I could be away. I cannot say how long he remained unconscious, but I would say around four or five days. His right eye was swollen and closed entirely and, of course, he was lifeless, and he was bleeding from his nose and mouth, and also from his pelvic region. He bled from his pelvic region every day the *Page 824 
entire time he was in the hospital. The bleeding came from the inside. There was no indication on the outside. . . . I was present at the operation on his back or spinal puncture. There was an attempt made to do a lumbar puncture, but the doctors were not successful, due to the nervous condition of the patient. That was while he was in the hospital. I think they tried it twice, but I cannot say exactly. It was more than once." The plaintiff was thirty-one years of age, weighed 168 pounds and, prior to the injury, a strong and healthy man.
M. E. Fox testified, in part: "I was hailed by someone and found him (J. S. Gasque) in a water meter. I learned later it was Mr. Johnson. . . . I got out. I saw Mr. Gasque with one leg in the water meter, down in the water meter box, and the lid of the water meter box and side of his head on the sidewalk. The side of his head was laying over on the sidewalk and his leg down in there. It was on my right-hand side going west, the north side. It was on the sidewalk. I think a little to the right-hand side, the north side. There was a kind of sloped bank by the sidewalk. The meter box was close to that, a dirt bank. Gasque was just laying there like a dead man, so I picked him up out of the meter box and I told Mr. Johnson to let's carry him to the hospital. I picked him up, Johnson seemed to be just scared. I picked him up and put him in my car and carried him to Dr. Gardner's Hospital. . . . I picked him up in my arms and kicked the lid up over there, but it did not seem to fit so well, and I told the policeman he better go see about it. When I stepped on the lid it kind of tilted. . . . It was so dark I could not see whether dirt was on the meter box."
Howard Johnson testified, in part: "I don't know how much it would weigh. It was lighter than the ones on the meter right below there, in front of the house just below this meter, in front of 841. . . . The old meter lids rested on a rim and a flange that was set in the concrete in the sidewalk. That was in 1933. It did not sit there hardly at all because there was too much dirt all around it. Dirt in the flange. It did not rest flat. One side might have been higher than the other. I don't say that it did. I cut the dirt down, but I did not notice whether one side was higher or lower than the other. I don't know whether one was higher or not. It was an ordinary meter lid like the city has used for a long time until Mr. Israel put the new ones on that has a wide flange that sits down on the lid. This was one of the old-style lids."
James G. Hyde testified, in part: "We went there and Johnson turned the spot light on the box that you can shine, he got on his knees and stoop up. I noticed him cleaning it out, and that is about all that I know about it. The box is about six inches from the bank outside — the nearest point of the box from the outside of the street. There is a *Page 825 
small bank. It was six inches from the bank. The right-hand side. . . . The dirt bank seemed to be evidently very hard, because Mr. Johnson took some time to get it out. Evidently back in there hard because he had a knife cleaning it out. Before he cleaned it out he pushed it over to the proper place and moved it. It evidently had some at different points because it had a tendency to rock, and that is when he took it up and cleaned it. He tried to fit it in first. It tilted back and forth. He then took a knife and tried to remove the dirt. The dirt bank was fourteen inches high, maybe a little higher, and there is a hedge on top of that. It was a privet hedge. I don't know hardly how to describe the lid. It was one of those regular little lids with checked top. There were not any flanges on the top piece, I don't think."
H.C. Smith testified, in part: "I went up there to the water meter hole at 841 Haywood Road. I have my car and Mr. Gasque's younger brother was with me. I drove my car and Mr. Gasque's younger brother was with me, and Mr. Robinson and two or three other parties went in another car. We went to this hole, and I was one of the first there. I observed the lid on the hole at that time. I first stepped on the edge of the lid, and it would rock, the side I would step on. I would go down in the hole and the other end on the other side would tilt up. I lifted the lid out of the hole. I noticed that there was dirt caked around inside rim of this meter box and the lid would not fit down in the hole.
"I took the lid out without any kind of instrument. I took it out with my hand. There was dirt caked around this inner rim and there was one of the men in the party had a flashlight that was turned on this hole, and either Mr. Robinson or Mr. Johnson, who was up there by that time, tried to scrape out the dirt with a coin and could not do it with that. Mr. Johnson was there. It was either him or one of the other parties. They did not have any luck with the coin, so a knife was used to cut the dirt around the inside of the ring. The lid did not hit by then. It would rattle when you would press on it with your foot. It would not fit at all. It was raised above the level of the rim, and I just picked it up with my fingers."
E. M. Israel testified, in part: "I was born and raised in Asheville, a little over 62 years ago. I was an official of the city of Asheville for a little over 30 1/2 years, having maintenance of water and sewer, making connections and setting meters and gravity mains coming in. I was so engaged when the town of West Asheville was taken into the city. While an official of the city of Asheville, I caused water meter lids for water meter boxes to be changed. We had a lid with a ring on the under side to fit around the box to keep the lid, and also had a catch that you *Page 826 
could run it around and lock it, to keep it from kicking out. I resigned 3 July, 1931. I know the type of water meter lid in general and approved use in April, 1933. It was a lid with a ring that goes down inside the rim that sits on the meter box and the ring type, you might call it.
"Q. Does that have any facilities for locking or securing it? A. `Yes, well, this ring that goes down through the base of the box an inch or an inch and a half, you have to raise it up to get it out. There is no way to push it out. You cannot push it out with your foot. . . . If you will allow me, I will explain the trouble with the lightweight lid without a ring. There is naturally a space where they sit in the base of the meter box in which dirt accumulates. It is possible it will go under one side and not on the other, and out she goes. Any little jar will throw it out. Yes, but with the flange that comes down on the rim an inch or better, it cannot pick it up. It just settles in there. It is different from the flange, from the meter lid without the ring. Just a little groove. There are different types of boxes. The one in Asheville and the county, I think the county uses practically the same as we do in Asheville, the one with the ring is safe. The one without the ring is absolutely unsafe. I venture to say thereare mighty few, if any, safe without the ring to hold them.' "
Viola Gasque, plaintiff's wife's testimony was to the effect: That she immediately went to the hospital the night of the injury; saw his condition — described his condition in detail, and testified as follows: "He suffered pain and his condition was nervous. He and I occupy the same room and same bed at night. He has taken drugs to alleviate his pain. He suffered such intense pain when he first came home that he was given drugs to ease this pain. I believe he took those drugs two to four hours, according to the severity of the pain. I met Mr. Gasque 18 May, 1925. I believe that it is almost 9 years I never knew of his being sick from the time that we were married, 4 years before this accident. He never had been confined to bed or complained of any illness. Q. What has been the condition of his health since 7 April, 1933? A. `It has been bad.' " The defendant excepted and assigned error to the above question.
The defendant had meter readers to read the city water meters.
The issues submitted to the jury and their answers thereto were as follows: "(1) Was injury to the plaintiff J. S. Gasque caused by the negligence of the defendant city of Asheville, as alleged in the complaint? A. `Yes.' (2) What damage, if any, is the plaintiff J. S. Gasque entitled to recover of the defendant city of Asheville? A. `$7,500.'" *Page 827 
Judgment was rendered in the court below on the verdict. The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
At the close of plaintiff's evidence and at the close of all the evidence the defendant made motions for judgment as in case of nonsuit in the court below. C. S., 567. The court below overruled these motions, and in this we can see no error.
On motion to dismiss, or judgment of nonsuit, the evidence is to be taken in the light most favorable to the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. An exception to a motion to dismiss in a civil action taken after the close of the plaintiff's evidence, and renewed by defendant after the introduction of his own evidence does not confine the appeal to the plaintiff's evidence alone, and a judgment will be sustained under the second exception if there is any evidence on the whole record of the defendant's liability.
The defendant excepted and assigned as error the question propounded to Viola Gasque, wife of plaintiff: "Q. What has been the condition of his health since 7 April, 1933? A. `It has been bad.'" We do not think this exception and assignment of error can be sustained. The wife, Viola Gasque, from her testimony, had every opportunity for observation.
In Sherrill v. Telegraph Co., 117 N.C. 352 (363), we find: "The mental state or appearance of a person, or his manner, habit, conduct, or bodily condition, as far as they can be derived from mere observation as distinguished from medical examination, may be proved by the opinion of one who has had opportunities to form it."
In S. v. Brodie, 190 N.C. 554 (555), citing McKelvey on Evidence, 172, 231, and other authorities, we find: "It is a familiar principle that one who is called to testify is usually restricted to facts within his knowledge; but if by reason of opportunities for observation he is in a position to judge of the acts more accurately than those who have not had such opportunities, his testimony will not be excluded on the ground that it is a mere expression of opinion."
In Wigmore on Evidence, Vol. 1 (2d Ed.), ch. 22, sec. 568 (1), p. 974, speaking to the subject, we find: "While on matters strictly involving medical science, as such, some special skill is needed, yet there are *Page 828 
numerous related matters, involving health and bodily soundness, upon which the ordinary experience of everyday life is entirely sufficient. The line may sometimes be difficult to draw; but there can be no difficulty in determining that a layman may be received to state (for example) that a person was or was not apparently ill. Great liberality should be shown by the courts in applying this principle, so that the cause of justice may not be obstructed by narrow and finical rulings." In the note to the above there are abundant authorities cited showing that the testimony of laymen in matters of this kind is admissible.
From the other evidence in the case, the question is at least not prejudicial. The defendant tendered certain issues to be submitted to the jury. As there was no evidence of contributory negligence, no issue was tendered on that defense set up in the answer of defendant. The matter set forth in the issues tendered by defendant were considered under the first issue, and we see no error in not submitting the issues tendered by defendant. The charge of the court below on the first issue took into consideration the facts involved in the other issues tendered by defendant. The issues submitted afforded the parties an opportunity to introduce all pertinent evidence and apply it fairly.
Issues submitted are largely in trial court's discretion, and if not prejudicial or affecting substantial rights, will ordinarily not be held error. Grier v. Weldon, 205 N.C. 575.
"The duty of the municipal corporation in reference to streets is stated as follows in Bailey v. Winston, 157 N.C. 259: `A city or town or village must keep its streets in good condition and repair, so that they will be safe for the use of its inhabitants or of those entitled and having occasion to use them. If they become unfit for use by reason of defects which could not be anticipated and consequently guarded against, under ordinary circumstances, the municipality should have some notice of the defect, either actual or else implied from the circumstances; and in this connection it must be said that it is the duty of the city (and, of course, these principles apply generally to all forms of municipalities) to exercise a reasonable and continuing supervision over its streets, in order that it may know they are kept in a safe and sound condition for use. Sometimes notice of their defective condition is actual or express, again it is constructive or implied, where, for instance, the defect has existed for such a length of time as to show that the city has omitted or neglected its plain duty of supervision; and still again, it may be inferred by the jury from the facts in evidence. This principle is illustrated and was applied in Fitzgerald v. Concord, supra (140 N.C. 110), where it is said, approving 1 Sh. and Red. on Negligence, sec. 369: "Unless some statute requires it, actual notice is not a necessary condition of corporate liability for the defect which caused the injury. Under its duty of *Page 829 
active vigilance, a municipal corporation is bound to knew the condition of its highways, and for practical purposes the opportunity of knowing must stand for actual knowledge. Hence, when observable defects in a highway have existed for a time so long that they ought to have been seen, notice of them is implied, and is imputed to those whose duty it is to repair them; in other words, they are presumed to have been discovered by the exercise of reasonable diligence." . . . "On the question of notice implied from the continued existence of a defect, no definite or fixed rule can be laid down as to the time required, and it is usually a question for the jury on the facts and circumstances of each particular case, giving proper consideration to the character of the structure, its material, the time it has been in existence and use, the nature of the defect, its placing," and in other considerations not necessary to be stated.' " Bailey v. Asheville, 180, N.C. 645 (657-8); Michaux v. Rocky Mount, 193 N.C. 550; Markham v.Improvement Co., 201 N.C. 117 (120); Speas v. Greensboro, 204 N.C. 239.
The court below charged fully and accurately as to the burden of the issue by the greater weight of the evidence being on plaintiff, also negligence and proximate cause. The court below charged the jury to which no exception was taken: "The governing authorities of a city are charged with the duty of keeping their streets and sidewalks and water meter boxes in a reasonably safe condition; and their duty does not end with putting them in a safe and sound condition originally, but they are required to keep them so to the extent that this can be accomplished by proper and reasonable care and continuing supervision.
"It is the duty of the city of Asheville to keep the streets, including the sidewalks and meter boxes thereon and nearby, in proper repair; that is, in such condition as that the people passing and repassing over them might at all times do so with reasonable ease, speed, and safety.
"It is not the duty of the city, however, to warrant that the condition of its streets and sidewalks and meter boxes shall be at all times absolutely safe. The city is not an insurer of their safety; the city is only required to exercise ordinary or reasonable care to make them safe. The city is only responsible for negligent breach of duty and to establish such responsibility it is not sufficient to show that a defect existed and an injury has been caused thereby. It must be further shown that the officers of the city knew or by the exercise of due care might have known of the defect, and that the character of the defect was such that injury to travellers therefrom might be reasonably anticipated.
"It will be observed that actual notice of a dangerous condition or defective structure is not required, but notice may be implied from circumstances, and will be imputed to the city if its officers could have discovered the defect by the exercise of due care or proper diligence. *Page 830 
Actual notice is not a necessary condition to render the city liable for a defect which causes an injury. Under its duty of actual diligence, a municipal corporation is bound to know the condition of its sidewalks and meter boxes, where the opportunity of such knowledge exists; the opportunity of knowing stands for actual knowledge. A city is presumed to have notice of such defects as it might have discovered by due care or reasonable diligence, but the most that is required of a city is the use of ordinary diligence by making inspections and examinations with reasonable frequency and due care to ascertain and remedy them.
"It is the duty of a city to exercise due care to keep its streets and sidewalks and meter boxes in good condition and repair, so that they will be safe for the use of its inhabitants, or those entitled and having occasion to use them. If they become unfit for use by reason of defects which could not be anticipated, and consequently guarded against, the municipality must have some notice of the defect before it can be held liable for any injury proximately caused thereby. Sometimes notice of such defects is actual or express, and, again, sometimes such notice is constructive or implied. It is the duty of a city to exercise a reasonable and continuing supervision over its streets and sidewalks in order that it may know they are kept in safe condition."
The evidence was to the effect that the water meter was so located that dirt washed down and caked around the inner rim which prevented it from fitting and it would tilt up. There was evidence that those who read the meter each month saw or in the exercise of due care could have seen this situation. The water meter was an old kind and had been there many years. Israel testified unobjected to: "The one with the ring is safe. The one without the ring is absolutely unsafe."
Smith testified: "I first stepped on the edge of the lid and it would rock the side I would step on. I would go down in the hole and the other end on the other side would tilt up. I lifted the lid out of the hole. I noticed that there was dirt caked around the inside rim of this meter box and the lid would not fit down in the hole."
We think the charge fully supported by the authorities in this jurisdiction and applicable to the facts in this case. We have examined the exceptions and assignments of error to the charge and do not think they can be sustained. On the question of damage, the court below charged the jury: "It is for the jury to say, under all the circumstances established by the evidence, what is a fair and reasonable sum which the defendant should pay to the plaintiff by way of compensation for injury sustained. The age and occupation of the injured party, the nature and extent of his business, the value of his services, the amount that he was earning at the time of his injury, or whether he was employed at the time, are all matters to be considered. The award is to be made, if *Page 831 
made at all, on the basis of a cash settlement now for plaintiff's injuries, past, present, and prospective. Where future payments for loss of earning power are to be anticipated by the jury and capitalized into the verdict the plaintiff is entitled only to their present worth."
The evidence as to damage supported the charge. This charge is fully approved by the authorities. Campbell v. R. R., 201 N.C. 102 (108). The defendant submitted four prayers for special instructions. We see no error in refusing the first three, the fourth, which is as follows, was given substantially in the general charge: "The city, however, is not held to warrant that the condition of its streets shall be at all times absolutely safe; it is only responsible for a negligent breach of duty, and to establish such responsibility, it is not sufficient to show that a defect existed and an injury has been caused thereby. It must be further shown that the officers of the city knew, or by ordinary diligence might have discovered, the defect, and the character of the defect was such that injuries to travelers therefrom might reasonably be anticipated."
The first three prayers were not entirely supported by the facts in evidence. We think the charge of the court below covered the law applicable to the facts. The court below gave the contentions accurately and fairly to both litigants and set forth the law applicable to the facts in an able and careful charge. We can see no error. The other exceptions and assignments of error are immaterial and present no new or novel propositions of law.
On the entire record we can see no prejudicial or reversible error.
No error.
SCHENCK, J., took no part in the consideration or decision of this case.